FILED

DEC 22 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF HAWAII; ISMAIL ELSHIKH; JOHN DOES, 1 & 2; MUSLIM ASSOCIATION OF HAWAII, INC., <br><br> Plaintiffs-Appellees, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN M. NIELSEN, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX W. TILLERSON, in his official capacity as Secretary of State; UNITED STATES OF AMERICA, <br><br> Defendants-Appellants. | No.   17-17168 <br><br> D.C. No. 1:17-cv-00050-DKW-KSC District of Hawaii, Honolulu <br><br> ORDER |

Before:  HAWKINS, GOULD, and PAEZ, Circuit Judges.

The opinion disposition filed on December 22, 2017, is withdrawn and a

new opinion disposition is filed concurrently with this order.

FILED

UNITED STATES COURT OF APPEALS

DEC 22 2017

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

STATE OF HAWAII; ISMAIL ELSHIKH;
JOHN DOES, 1 & 2; MUSLIM
ASSOCIATION OF HAWAII, INC.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official
capacity as President of the United States;
U.S. DEPARTMENT OF HOMELAND
SECURITY; KIRSTJEN M. NIELSEN, in
her official capacity as Secretary of
Homeland Security; U.S. DEPARTMENT
OF STATE; REX W. TILLERSON, in his
official capacity as Secretary of State;
UNITED STATES OF AMERICA,

Defendants-Appellants.

No.    17-17168

D.C. No.
1:17-cv-00050-DKW-KSC

OPINION

Appeal from the United States District Court
for the District of Hawaii
Derrick Kahala Watson, District Judge, Presiding

Argued and Submitted December 6, 2017
Seattle, Washington

Before:  Michael Daly Hawkins, Ronald M. Gould, and Richard A. Paez, Circuit
Judges.

PER CURIAM:

For the third time, we are called upon to assess the legality of the President's efforts to bar over 150 million nationals of six designated countries[1] from entering the United States or being issued immigrant visas that they would ordinarily be qualified to receive. To do so, we must consider the statutory and constitutional limits of the President's power to curtail entry of foreign nationals in this appeal of the district court's order preliminarily enjoining portions of § 2 of Proclamation 9645 entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats" (the "Proclamation").

The Proclamation, like its predecessor executive orders, relies on the premise that the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., vests the President with broad powers to regulate the entry of aliens. Those powers, however, are not without limit. We conclude that the President's issuance of the Proclamation once again exceeds the scope of his delegated authority. The Government's interpretation of 8 U.S.C. § 1182(f) not only upends the carefully crafted immigration scheme Congress has enacted through the INA, but it deviates from the text of the statute, legislative history, and prior executive practice as well.

---

[1] Although Proclamation 9645 imposes varying restrictions on nationals of eight countries—Chad, Iran, Libya, Somalia, Syria, Yemen, North Korea, and Venezuela—Plaintiffs challenge only the restrictions imposed on the nationals of six Muslim-majority countries.

Further, the President did not satisfy the critical prerequisite Congress attached to his suspension authority: before blocking entry, he must first make a legally sufficient finding that the entry of the specified individuals would be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). The Proclamation once again conflicts with the INA's prohibition on nationality-based discrimination in the issuance of immigrant visas. Lastly, the President is without a separate source of constitutional authority to issue the Proclamation.

On these statutory bases, we affirm the district court's order enjoining enforcement of the Proclamation's §§ 2(a), (b), (c), (e), (g), and (h). We limit the scope of the preliminary injunction, however, to foreign nationals who have a bona fide relationship with a person or entity in the United States.

## I.    Background[2]

### A. Prior Executive Orders and Initial Litigation

On January 27, 2017, one week after his inauguration, President Donald J. Trump signed an Executive Order entitled "Protecting the Nation From Foreign Terrorist Entry into the United States." Exec. Order 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017) ("EO-1"). EO-1's stated purpose was to "protect the American people from terrorist attacks by foreign nationals admitted to the United States."

---

[2] Portions of the background section have been drawn from the district court's order below. *See Hawai'i v. Trump*, No. CV 17-00050 DKW-KSC, 2017 WL 4639560, at *1–4 (D. Haw. Oct. 17, 2017) ("*Hawai'i TRO*").

*Id*. EO-1 took effect immediately and was challenged in several venues shortly after it was issued. On February 3, 2017, a federal district court in the State of Washington enjoined the enforcement of EO-1. *See Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017). The Government filed an emergency motion seeking a stay of the injunction, which we denied. *See Washington v. Trump*, 847 F.3d 1151, 1161–64 (9th Cir. 2017) (per curiam), *reh'g en banc denied*, 853 F.3d 933 (9th Cir. 2017). The Government later voluntarily dismissed its appeal of the EO-1 injunction.

On March 6, 2017, the President issued Executive Order 13,780, which was given the same title as EO-1 and was set to take effect on March 16, 2017. 82 Fed. Reg. 13,209 (Mar. 6, 2017) ("EO-2"). EO-2 directed the Secretary of Homeland Security to conduct a global review to determine whether foreign governments were providing adequate information about their nationals seeking entry into the United States. *See* EO-2 § 2(a). EO-2 also directed the Secretary of Homeland Security to report those findings to the President; following the Secretary's report, nations identified as providing inadequate information were to be given an opportunity to alter their practices before the Secretary would recommend entry restrictions for nationals of noncompliant countries. *Id*. §§ 2(b), (d)–(f).

During this global review, EO-2 imposed a 90-day suspension on the entry of certain foreign nationals from six Muslim-majority countries: Iran, Libya,

Somalia, Sudan, Syria, and Yemen. *Id*. § 2(c). That 90-day suspension was challenged in multiple courts and was preliminarily enjoined by federal district courts in Hawai'i and Maryland. *See Hawai'i v. Trump*, 245 F. Supp. 3d 1227 (D. Haw. 2017); *Int'l Refugee Assistance Project* ("*IRAP*") *v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017). Those injunctions were affirmed by the Ninth and Fourth Circuits, respectively. *See Hawai'i v. Trump* (*Hawai'i I*), 859 F.3d 741 (9th Cir. 2017) (per curiam); *IRAP v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc), *as amended* (May 31, 2017). The Supreme Court granted a writ of *certiorari* in both cases and left the injunctions in place pending its review, except as to foreign nationals who lacked a "credible claim of a bona fide relationship with a person or entity in the United States." *Trump v. IRAP*, 137 S. Ct. 2080, 2088 (2017).

On September 24, 2017, the President issued the Proclamation, which indefinitely suspends immigration by nationals of seven countries and imposes restrictions on the issuance of certain nonimmigrant visas for nationals of eight countries. 82 Fed. Reg. 45,161, 45,164–67 (Sept. 24, 2017). The entry restrictions were immediately effective for foreign nationals who 1) were subject to EO-2's restrictions, and 2) lack a credible claim of a bona fide relationship with a person or entity in the United States. *Id.* at 45,171. For all other affected persons, the Proclamation was slated to take effect on October 18, 2017. *Id.* On October 10, 2017, the Supreme Court vacated the Fourth Circuit's opinion in *IRAP v. Trump* as

5

moot. *See Trump v. IRAP*, No. 16-1436, — S. Ct. —, 2017 WL 4518553 (U.S. Oct. 10, 2017). On October 24, 2017, the Supreme Court vacated our opinion in *Hawai'i I* on the same grounds. *See Trump v. Hawai'i*, No. 16-1540, — S. Ct. —, 2017 WL 4782860 (U.S. Oct. 24, 2017). In vacating our prior decision as moot, the Supreme Court explicitly noted that it expressed no view on the merits of the case. *See id.*

## B. Plaintiffs' Third Amended Complaint

On October 10, 2017, Plaintiffs sought to amend their complaint to include allegations related to the Proclamation. The third amended complaint includes statutory claims for violations of the INA, the Religious Freedom Restoration Act, and the Administrative Procedure Act, as well as constitutional claims for violations of the Establishment and Free Exercise Clauses of the First Amendment and the equal protection guarantees of the Fifth Amendment's Due Process Clause. Plaintiffs also moved for a temporary restraining order; after expedited briefing, the district court granted the motion on October 17, 2017. *Hawai'i TRO*, 2017 WL 4639560, at *1. Relying on our now-vacated opinion in *Hawai'i I*, the district court found that the Proclamation suffered from the same deficiencies as EO-2. *Id.* at *1, *9–13. At the parties' request, the district court converted the temporary restraining order into a preliminary injunction on October 20, 2017, rendering it an

6

appealable order. *Hawai'i v. Trump*, No. CV 17-00050 DKW-KSC (D. Haw. Oct. 20, 2017), ECF No. 390 (order entering preliminary injunction).

The Government timely appealed. During the pendency of this appeal, we partially stayed the district court's preliminary injunction "except as to foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States." *Hawai'i v. Trump*, No. 17-17168, 2017 WL 5343014 (9th Cir. Nov. 13, 2017). On December 4, 2017, the Supreme Court granted the Government's request for a complete stay pending review of the district court's preliminary injunction. *Trump v. Hawai'i*, No. 17A550, — S. Ct. — (Dec. 4, 2017).

### C. The Proclamation

The Proclamation derives its purpose from the President's belief that he "must act to protect the security and interests of the United States." 82 Fed. Reg. at 45,161. In furtherance of this goal, the Proclamation imposes indefinite and significant restrictions and limitations on entry of nationals from eight countries whose information-sharing and identity-management protocols have been deemed "inadequate." *Id.* at 45,162–67. The Proclamation notes that screening and vetting protocols and procedures play a critical role in preventing terrorist attacks and other public safety threats by enhancing the Government's ability to "detect foreign nationals who may commit, aid, or support acts of terrorism." *Id.* at

7

45,162.  Thus, the Proclamation concludes, "absent the measures set forth in th[e] proclamation, the immigrant and nonimmigrant entry into the United States of persons described in section 2 of th[e] proclamation [will] be detrimental to the interests of the United States."  *Id.* at 45,161–62.

The President selected eight countries for inclusion in the Proclamation based on a "worldwide review" conducted under the orders of EO-2.  *Id.* at 45,161, 45,163–64.  As part of that review, the Secretary of the Department of Homeland Security established global requirements for information sharing "in support of immigration screening and vetting" that included a comprehensive set of criteria on the information-sharing practices, policies, and capabilities of foreign governments.  *Id.* at 45,161–63.  The Secretary of State then "engaged with the countries reviewed in an effort to address deficiencies and achieve improvements."  *Id.* at 45,161.  The Secretary of Homeland Security, after consultation with the Secretary of State and the Attorney General, ultimately identified 16 countries as "inadequate" based on "an analysis of their identity-management protocols, information-sharing practices, and risk factors."  *Id.* at 45,163.  An additional 31 countries were deemed "at risk" of becoming "inadequate."  *Id.*

Countries were classified as "inadequate" based on whether they met the "baseline" developed by the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence.  *Id*. at 45,162.  The

baseline incorporated three categories of criteria: 1) identity-management information; 2) national security and public-safety information; and 3) national security and public-safety risk assessment. *Id.* Identity-management information ensures that foreign nationals seeking to enter the United States are who they claim to be. *Id.* This category "focuses on the integrity of documents required for travel to the United States," including whether the country issues passports with embedded data to confirm identity, reports lost and stolen passports, and provides additional identity-related information when requested. *Id.* National security and public-safety information includes whether the country "makes available, directly or indirectly, known or suspected terrorist and criminal-history information upon request," whether it provides identity document exemplars, and whether the country "impedes the United States Government's receipt of information about passengers and crew traveling to the United States." *Id.* Finally, national security and public-safety risk assessment focuses on whether the country is "a known or potential terrorist safe haven," whether the country participates in the Visa Waiver Program, and whether the country "regularly fails to receive its nationals" following their removal from the United States. *Id.* at 45,162–63.

After a "50-day engagement period to encourage all foreign governments . . . to improve their performance," the Secretary of Homeland Security ultimately determined that Chad, Iran, Libya, North Korea, Syria,

Venezuela, and Yemen continued to be "inadequate" based on their identity-management protocols, information-sharing practices, and risk factors.[3]  *Id.* at 45,163.  The Secretary of Homeland Security also determined that Iraq did not meet the baseline requirements, but concluded that entry restrictions and limitations were not warranted because of the "close cooperative relationship between the United States and the democratically elected government of Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combating the Islamic State of Iraq and Syria (ISIS)."  *Id.*

On September 15, 2017, the Secretary of Homeland Security submitted a report to the President recommending entry restrictions for nationals from seven countries "determined to be 'inadequate' in providing such [requested] information and in light of the other factors discussed in the report."  *Id.*  After consultation with "appropriate Assistants to the President and members of the Cabinet, including the Secretaries of State, Defense, and Homeland Security, and the Attorney General" and "accounting for the foreign policy, national security, and

---

[3] The Proclamation does not include the other thirty-nine countries deemed either "inadequate" or "at risk" of becoming "inadequate."  *See* 82 Fed. Reg. at 45,163. As the district court noted, "the explanation for how the Administration settled on the list of eight countries is obscured."  *Hawai'i TRO*, 2017 WL 4639560, at *11 n.16.  This is due, in large part, to the fact that no court has been able to consider— or even view—the DHS report in question.

counterterrorism objectives of the United States," the President decided to "restrict and limit the entry of nationals of 7 countries found to be 'inadequate'": Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. *Id.* at 45,164. And although Somalia "generally satisfies" the information-sharing requirements of the baseline, the President also imposed entry restrictions and limitations on Somalia nationals because of "its government's inability to effectively and consistently cooperate, combined with the terrorist threat that emanates from its territory." *Id.* The President restricted entry of all immigrants from seven of the eight countries, and adopted "a more tailored approach" to the entry of nonimmigrants. *Id.* at 45,164–65.

Section 2's challenged country restrictions and proffered rationales are as follows:

Chadian nationals may not enter as immigrants or nonimmigrants on business, tourist, or business/tourist visas because, although Chad is "an important and valuable counterterrorism partner of the United States, and . . . . has shown a clear willingness to improve," it "does not adequately share public-safety and terrorism-related information," and several terrorist groups are active within Chad or the surrounding region. *Id.* at 45,165.

Iranian nationals may not enter as immigrants or nonimmigrants except under valid student and exchange visitor visas, and such visas are subject to

11

"enhanced screening and vetting." *Id*. The Proclamation notes that "Iran regularly fails to cooperate with the United States Government in identifying security risks, fails to satisfy at least one key risk criterion, is the source of significant terrorist threats, and fails to receive its nationals" following final orders of removal from the United States. *Id.*

The entry of Libyan nationals as immigrants and as nonimmigrants on business, tourist, or business/tourist visas is suspended because, although Libya "is an important and valuable counterterrorism partner," it "faces significant challenges in sharing several types of information, including public-safety and terrorism-related information," "has significant deficiencies in its identity-management protocols," does not "satisfy at least one key risk criterion," has not been "fully cooperative" in receiving its nationals after their removal from the United States, and has a "substantial terrorist presence" within its territory. *Id.* at 45,165–66.

The entry of all Syrian nationals—on immigrant and non-immigrant visas alike—is suspended because "Syria regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorist threats, and has been designated by the Department of State as a state sponsor of terrorism." *Id.* at 45,166. Syria also has "significant inadequacies in identity-

12

management protocols, fails to share public-safety and terrorism information, and fails to satisfy at least one key risk criterion." *Id.*

Yemeni nationals may not enter the United States as immigrants or nonimmigrants on business, tourist, or business/tourist visas because despite being "an important and valuable counterterrorism partner," Yemen "faces significant identity-management challenges, which are amplified by the notable terrorist presence within its territory." *Id.* at 45,166–67.

Somali nationals may not enter the United States as immigrants, and all nonimmigrant visa adjudications and entry decisions for Somali nationals are subject to "additional scrutiny." *Id.* at 45,167. Although Somalia satisfies information-sharing requirements, it "has significant identity-management deficiencies" and a "persistent terrorist threat also emanates from Somalia's territory." *Id.*

These restrictions apply to foreign nationals of the affected countries outside the United States who do not hold valid visas as of the effective date and who do not qualify for a visa under § 6(d)[4] of the Proclamation. *Id.* Suspension of entry does not apply to lawful permanent residents of the United States; foreign nationals

---

[4] Section 6(d) of the Proclamation permits individuals whose visas were marked revoked or canceled as a result of EO-1 to obtain "a travel document confirming that the individual is permitted to travel to the United States and seek entry under the terms" of the revoked or canceled visa. 82 Fed. Reg. at 45,171.

13

who are admitted, paroled, or have a non-visa document permitting them to travel to the United States and seek entry valid or issued on or after the effective date of the Proclamation; any dual national traveling on a passport issued by a non-designated country; any foreign national on a diplomatic visa; any refugee already admitted to the United States; or any individual granted asylum, withholding of removal, advance parole, or Convention Against Torture protection. *Id.* at 45,167–68. Further, a consular officer, the Commissioner of U.S. Customs and Border Protection, or the Commissioner's designee "may, in their discretion, grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended or limited if such foreign nationals demonstrate that waivers would be appropriate and consistent" with certain specified guidelines. *Id.* at 45,168.

## II. Justiciability

We first address several of the same justiciability arguments that we found unpersuasive in *Washington v. Trump* and *Hawai'i I*. Once more, we reject the Government's contentions. The Proclamation cannot properly evade judicial review.

### A. Ripeness

The Government argues that Plaintiffs' claims are speculative and not ripe for adjudication until a specific applicant is denied a visa.[5] We reject this argument. We conclude that the issues in this case are "fit for review," and that significant hardship to Plaintiffs would result from "withholding court consideration" at this point. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 812 (2003).

"Ripeness is peculiarly a question of timing, designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009) (alteration and internal quotation marks omitted) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000)). This case does not concern mere abstract disagreements. Instead, Plaintiffs challenge the Proclamation as implemented by the Department of State and the Department of Homeland Security. That is permissible. Under the traditional "pragmatic" approach to finality, an order may be immediately reviewable even if no "particular action [has been] brought against a particular [entity]." *U.S. Army*

---

[5] The Government does not challenge Plaintiffs' Article III standing on appeal. Nonetheless, we "have an obligation to consider Article III standing independently, as we lack jurisdiction when there is no standing." *Day v. Apoliona*, 496 F.3d 1027, 1029 n.2 (9th Cir. 2007). For the reasons set forth in the district court's order, we conclude that Plaintiffs have Article III standing. *See Hawai'i TRO*, 2017 WL 4639560, at *4–7.

*Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 150 (1967)).

Moreover, contrary to the Government's position, the Proclamation's waiver provisions are not a "sufficient safety valve" and do not mitigate the substantial hardships Plaintiffs have already suffered and will continue to suffer due to the Proclamation. *Washington*, 847 F.3d at 1168–69. Plaintiff Muslim Association of Hawaii, for example, has already lost members as a result of the Proclamation and its predecessors, and expects to lose more. The mere possibility of a discretionary waiver does not render Plaintiffs' injuries "contingent [on] future events that may not occur." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). "[W]ithholding court consideration" at this juncture would undoubtedly result in further hardship to Plaintiffs. *See Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. We therefore conclude that Plaintiffs' claims are ripe for review.

## B. Doctrine of Consular Nonreviewability

As in the litigation over EO-1 and EO-2, the Government contends that we are precluded from reviewing the Proclamation by the consular nonreviewability doctrine. Under that doctrine, "the consular official's decision to issue or withhold a visa is not subject either to administrative or judicial review." *Li Hing of Hong Kong, Inc. v. Levin*, 800 F.2d 970, 971 (9th Cir. 1986). In other words, "it is not

16

within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a *given* alien." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (emphasis added). Although the political branches' power to exclude aliens is "largely immune from judicial control," it is not *entirely* immune; such decisions are still subject to "narrow judicial review." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citations omitted). Moreover, this case is not about individual visa denials, but instead concerns "the President's *promulgation* of sweeping immigration policy." *Washington*, 847 F.3d at 1162. Reviewing the latter "is a familiar judicial exercise," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012); courts do not hesitate to reach "challenges to the substance and implementation of immigration policy." *Washington*, 847 F.3d at 1163. Although "[t]he Executive has broad discretion over the admission and exclusion of aliens, [] that discretion is not boundless. It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie." *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd by an equally divided court*, 484 U.S. 1 (1987).

The Government's arguments to the contrary are foreclosed by *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187–88 (1993). In *Sale*, the Supreme

Court reviewed on the merits whether the President had violated the INA and the United States' treaty obligations by invoking his authority under 8 U.S.C. § 1182(f) to "suspend[] the entry of undocumented aliens from the high seas." *Id.* at 160. By reaching the merits, *Sale* necessarily first decided that the Court had jurisdiction to review whether the President's orders under the color of § 1182(f) were *ultra vires*. *See id.* at 187–88. As in *Sale*, here we determine whether the Proclamation goes beyond the limits of the President's power to restrict alien entry.

Because *Sale* did not address the Court's jurisdiction explicitly, the Government speculates that the Supreme Court "could have decided it was unnecessary to" reach this issue, "given that the Court agreed with the government on the merits." We disagree. Instead, the argument "that a court may decide [questions on the merits] before resolving Article III jurisdiction" is "readily refuted." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). "Without jurisdiction the court cannot proceed at all in any cause." *Id.* at 94 (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). "On every writ of error or appeal, the first and fundamental question is that of jurisdiction . . . ." *Id.* (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)). While it is true that "drive-by jurisdictional rulings . . . have no precedential effect," *Sale* was not a case where jurisdiction "had been assumed by the parties" and so went unaddressed. *Id.* at 91. To the contrary, as the Government concedes, the parties

in *Sale* thoroughly briefed and debated this issue. *See* U.S. Br. 13–18 (No. 92-344); Resp. Br. 50–58 (No. 92-344); Reply Br. 1–4 (No. 92-344).

Judicial review of the legality of the Proclamation respects our constitutional structure and the limits on presidential power. The consular nonreviewability doctrine arose to honor Congress's choices in setting immigration policy—not the President's. *See Sing v. United States*, 158 U.S. 538, 547 (1895). This doctrine shields from judicial review only the enforcement "through executive officers" of Congress's "declared [immigration] policy," *id.*, not the President's rival attempt to set policy. The notion that the Proclamation is unreviewable "runs contrary to the fundamental structure of our constitutional democracy."[6] *Washington*, 847 F.3d at 1161. We have jurisdiction to review such an action, and we do so here.

## C. Cause of Action and Statutory Standing

---

[6] The Government argues that the President, at any time and under any circumstances, could bar entry of all aliens from any country, and intensifies the consequences of its position by saying that no federal court—not a federal district court, nor our court of appeals, nor even the Supreme Court itself—would have Article III jurisdiction to review that matter because of the consular nonreviewability doctrine. United States Court of Appeals for the Ninth Circuit, *17-17168 State of Hawaii v. Donald Trump*, YouTube (Dec. 7, 2017) at 13:01–17:33, https://www.youtube.com/watch?v=9Q0p_B40Pa8. Particularly in the absence of an explicit jurisdiction-stripping provision, we doubt whether the Government's position could be adopted without running roughshod over the principles of separation of powers enshrined in our Constitution.

The Government also contends that Plaintiffs' statutory claims are unreviewable for lack of a cause of action and lack of statutory standing. We disagree.

### 1. APA Cause of Action

We begin first by examining whether Plaintiffs' claims are reviewable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. Although the President's actions fall outside the scope of direct review, *see Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive," *id.* at 828 (Scalia, J., concurring); *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1324, 1328 (D.C. Cir. 1996) (holding that the court could review whether an executive order conflicted with a federal statute where plaintiffs had sought to enjoin executive branch officials implementing the order). Here, Plaintiffs bring suit not just against the President, but also against the entities charged with carrying out his instructions: the Department of State and the Department of Homeland Security. Further, because these agencies have "consummat[ed]" their implementation of the Proclamation, from which "legal consequences will flow," their actions are "final"

20

and therefore reviewable under the APA.[7] *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation and internal quotation marks omitted).

Finally, the Government argues that the APA precludes review of actions committed to "agency discretion by law," 5 U.S.C. § 701(a)(2), and that the Proclamation is such an action. Plaintiffs counter that the Proclamation is not an unreviewable discretionary action, but rather is cabined by discernible constitutional and statutory limits. We are not persuaded by the Government's characterization of the Proclamation as an action committed to the Executive's discretion. This exception to the presumption of judicial review is "very narrow," applying only where "statutes are drawn in such broad terms that . . . there is no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)). It does not apply where, as here, a court is tasked with reviewing whether an executive action has exceeded statutory authority. *See Assiniboine & Sioux Tribes v. Bd. of Oil & Gas Conservation*, 792 F.2d 782, 791–92 (9th Cir. 1986) (collecting cases).

### 2. Zone of Interests

The Government additionally argues that even if an APA cause of action exists, Plaintiffs cannot avail themselves of it because they do not fall within the

---

[7] The Government contends that there is no "final" agency action here because Plaintiffs' claims are unripe. For the reasons discussed previously, we reject this argument.

21

INA's zone of interests. Once again, we are tasked with determining whether Plaintiffs' interests "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

We conclude that Dr. Elshikh's challenge to the Proclamation falls within the INA's zone of interests. He asserts that the Proclamation prevents his brothers-in-law from reuniting with his family. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 471–72 (D.C. Cir. 1995) ("The INA authorizes the immigration of family members of United States citizens and permanent resident aliens. In originally enacting the INA, Congress implemented the underlying intention of our immigration laws regarding the preservation of the family unit. Given the nature and purpose of the statute, the resident appellants fall well within the zone of interest Congress intended to protect." (internal citations and alterations omitted)), *vacated on other grounds*, 519 U.S. 1 (1996). John Does 1 and 2 fall within the same zone of interest, alleging that they will be separated from family members—a son-in-law and a mother, respectively.

The Government maintains that these interests are inadequate because a relative of an alien seeking admission has no right to participate in visa proceedings. Yet the Supreme Court has reviewed the merits of cases brought by U.S. residents with a specific interest in the entry of a foreigner, as have we. *See,*

22

*e.g.*, *Kerry v. Din*, 135 S. Ct. 2128, 2131 (2015) (involving a challenge by U.S. citizen to denial of her husband's visa); *Kleindienst v. Mandel*, 408 U.S. 753, 756–60 (1972) (arising from a challenge by American professors to denial of visa to journalist invited to speak at academic events); *Cardenas v. United States*, 826 F.3d 1164, 1167 (9th Cir. 2016) (addressing a U.S. citizen's challenge to denial of husband's visa). In a case similar to the one before us, *Legal Assistance for Vietnamese Asylum Seekers v. Department of State*, the D.C. Circuit found that visa sponsors had standing to sue when they alleged that the State Department's refusal to process visa applications resulted in an injury to the sponsors. 45 F.3d at 471–73.

Likewise, Hawai'i's "efforts to enroll students and hire faculty members who are nationals from the six designated countries fall within the zone of interests of the INA." *Hawai'i I*, 859 F.3d at 766. The INA clearly provides for the admission of nonimmigrant students into the United States. *See* 8 U.S.C. § 1101(a)(15)(F) (identifying students qualified to pursue a full course of study); 8 C.F.R. § 214.2(f) (providing the requirements for nonimmigrant students, including those in colleges and universities). The INA also provides that nonimmigrant scholars and teachers may be admitted into the United States. *See, e.g.*, 8 U.S.C. § 1101(a)(15)(J) (identifying students, scholars, trainees, and professors in fields of specialized knowledge or skill, among others); *id.* §

23

1101(a)(15)(H) (identifying aliens working in specialty occupations); *id.* §

1101(a)(15)(O) (identifying aliens with extraordinary abilities in the sciences, arts,

education, business, or athletics).  As we have said before, "[t]he INA leaves no

doubt" that Hawai'i's interests in "student- and employment-based visa petitions

for its students and faculty are related to the basic purposes of the INA."  *Hawai'i*

*I*, 859 F.3d at 766.

Further, the Muslim Association of Hawai'i (the "Association") alleges that

its members will suffer harms such as separation from their families, and that the

Association itself will suffer the loss of its members if it is not granted a

preliminary injunction.

Once again, we conclude that "Plaintiffs' claims of injury as a result of the

alleged statutory violations are, at the least, '*arguably* within the zone of interests'

that the INA protects" and therefore judicially reviewable.  *Id.* at 767 (quoting

*Bank of Am. Corp. v. City of Miami*, — U.S. —, 137 S. Ct. 1296, 1303 (2017)

(citation omitted) (emphasis added).

### 3.  Equitable Cause of Action

Even if there were no "final agency action" review under the APA, courts

have also permitted judicial review of presidential orders implemented through the

24

actions of other federal officials.[8]  This cause of action, which exists outside of the

APA, allows courts to review *ultra vires* actions by the President that go beyond

the scope of the President's statutory authority.  *See Reich*, 74 F.3d at 1327–28

(citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108, 110 (1902)

and *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958)) (permitting challenge to an

Executive Order promulgated by the president and implemented by the Secretary

of Labor, despite the lack of a final agency action under the APA); *see also*

*Duncan v. Muzyn*, 833 F.3d 567, 577–79 (6th Cir. 2016); *R.I. Dep't Envtl. Mgmt.*

*v. United States*, 304 F.3d 31, 40–43 (1st Cir. 2002); *cf. Armstrong v. Exceptional*

*Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (citing *McAnnulty* for the

proposition that federal courts may enjoin "violations of federal law by federal

officials").  When, as here, Plaintiffs challenge the President's statutory authority

to issue the Proclamation, we are provided with an additional avenue by which to

review these claims.

Having concluded that Plaintiffs' claims are justiciable, we now turn to the

district court's preliminary injunction.

### III.   The Preliminary Injunction

---

[8] The Supreme Court has decided the merits of such claims, including the specific claim that an action exceeded the authority granted under § 1182(f).  *See Sale*, 509 U.S. at 187–88; *see also Dames & Moore v. Regan*, 453 U.S. 654 (1981).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. We may affirm the district court's entry of the preliminary injunction "on any ground supported by the record." *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1159 (9th Cir. 2011).

## A. Likelihood of Success on the Merits

We consider first whether Plaintiffs are likely to succeed on the merits. In so doing, we consider four arguments[9] advanced by Plaintiffs: (1) the President has exceeded his congressionally delegated authority under 8 U.S.C. § 1182(f); (2) the President has failed to satisfy § 1182(f)'s requirement that prior to suspending entry, the President must find that entry of the affected aliens would be detrimental to the interests of the United States; (3) the Proclamation's ban on immigration from the designated countries violates 8 U.S.C. § 1152(a)(1)(A)'s prohibition on nationality-based discrimination; and (4) the President lacks the authority to issue

---

[9] As we explain below, we decline to reach Plaintiffs' arguments other than those listed here.

26

the Proclamation in the absence of a statutory grant. We address each in turn.

### 1. Scope of Authority under § 1182(f)

In determining whether the President has the statutory authority to issue the Proclamation under 8 U.S.C. § 1182(f), we begin with the text. *See Sale*, 509 U.S. at 171; *Haig v. Agee*, 453 U.S. 280, 289–90 (1981). But our inquiry does not end there. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000); *see also United States* v. *Witkovich*, 353 U.S. 194, 199 (1957) (declining to "read in isolation and literally" an immigration statute that "appear[ed] to confer upon the Attorney General unbounded authority"). In *Brown & Williamson*, the Court looked beyond the "particular statutory provision in isolation," and interpreted the statute to create a "symmetrical and coherent regulatory scheme." 529 U.S. at 132–33. The Court thus undertook a holistic review, which entailed examining the statute's legislative history, *see id.* at 146–47, "congressional policy," *id.* at 139, and "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude," *id.* at 133.

Taking guidance from the Court's instructions in *Brown & Williamson* to look beyond the challenged "provision in isolation," *id.* at 132, we conclude that the Proclamation is inconsistent not just with the text of § 1182(f), but with the statutory framework as a whole, legislative history, and prior executive practice.

Although no single factor may be dispositive, these four factors taken together strongly suggest that Plaintiffs are likely to succeed on their claim that the President has exceeded his delegated authority under section 1182(f). We discuss each factor in greater detail below.

### a. Statutory Text

We turn first to the text of § 1182(f). The INA grants the President the power to "*suspend* the entry of . . . any class of aliens" "for *such period* as he shall deem *necessary*." 8 U.S.C. § 1182(f) (emphasis added). We note at the outset that broad though the provision may be, the text does not grant the President an unlimited exclusion power.

Congress's choice of words is suggestive, at least, of its hesitation in permitting the President to impose entry suspensions of unlimited and indefinite duration. "The word 'suspend' connotes a temporary deferral." *Hoffman ex rel. N.L.R.B. v. Beer Drivers & Salesmen's Local Union No. 888*, 536 F.2d 1268, 1277 (9th Cir. 1976) (citing Webster's Third New International Dictionary (1966) and Bouvier's Law Dictionary (3d ed. 1914)). "[T]he word 'period,'" in turn, "connotes a stated interval of time commonly thought of in terms of years, months, and days." *United States v. Updike*, 281 U.S. 489, 495 (1930). This construction

of the term "period" is reinforced by the requirement that it be "necessary." [10] § 1182(f).

At argument, the Government contended that the indefinite duration of the Proclamation's entry restrictions is consistent with the text of § 1182(f). United States Court of Appeals for the Ninth Circuit, *17-17168 State of Hawaii v. Donald Trump*, YouTube (Dec. 7, 2017) at 22:45–23:15. Citing to § 4 of the Proclamation, which provides for a review of the restrictions every 180 days, the Government argued that because the suspensions will be "revisited" twice a year, the Proclamation is less indefinite than President Reagan's and President Carter's orders regarding Cubans and Iranians,[11] respectively. *Id.* at 23:04–23:14. This argument is unpersuasive.

The Government has repeatedly emphasized that the travel restrictions are necessary to incentivize and pressure foreign governments into improving their information-sharing and identity-management practices. This creates a peculiar situation where the restrictions may persist ad infinitum. To paraphrase a well-

---

[10]  As we discuss later, although prior executive orders or proclamations invoking § 1182(f) did not provide for a set end date, they were noticeably narrower in scope than the Proclamation. At the very least, Congress in adopting § 1182(f) likely did not contemplate that an executive order of the Proclamation's sweeping breadth would last for an indefinite duration.

[11] Proclamation 5517, 51 Fed. Reg. 30,470 (Aug. 22, 1986) (Cuba order); Exec. Order 12172, 44 Fed. Reg. 67,947 (Nov. 26, 1979) (Iran order), *amended by* Exec. Order 12206, 45 Fed. Reg. 24,101 (Apr. 7, 1980).

known adage, the Proclamation's review process mandates that the restrictions will continue until practices improve. The Proclamation's duration can be considered definite only to the extent one presumes that the restrictions will, indeed, incentivize countries to improve their practices. Where, as here, there is little evidence to support such an assumption, the Proclamation risks producing a virtually perpetual restriction—a result that the plain text of § 1182(f) heavily disfavors for such a far-reaching order.[12]

### b. Statutory Framework

We next examine the statutory framework of the INA. *Brown & Williamson*, 529 U.S. at 133. We first note that the Constitution gives Congress the primary, if not exclusive, authority to set immigration policy. *See Arizona v. United States*, 567 U.S. 387, 409 (2012) (citing *Galvan v. Press*, 347 U.S. 522, 531 (1954)); *see also Fiallo*, 430 U.S. at 792 ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of

---

[12] Because issuing indefinite entry restrictions under these circumstances violates § 1182(f), we further view § 1182(f) as prohibiting a series of temporary bans when it appears such serial bans are issued to circumvent the bar on indefinite entry restrictions. *See also* Brief of T.A., a U.S. Resident of Yemeni Descent, as Amicus Curiae, Dkt. No. 41 at 7–8 (arguing that § 1182(f)'s use of the singular as it relates to "proclamation" and "period" is meaningful and precludes the use of serial bans to bypass the bar on indefinite suspensions, and noting that other provisions in § 1182 specifically use plural nouns to authorize multiple actions by the executive branch).

30

aliens." (citation and internal quotation marks omitted)); *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 340 (1909) ("[T]he authority of Congress over the right to bring aliens into the United States embraces every conceivable aspect of that subject . . . ."). Congress has delegated substantial power in this area to the Executive Branch, but the Executive may not exercise that power in a manner that conflicts with the INA's finely reticulated regulatory scheme governing the admission of foreign nationals.

In line with this principle, the D.C. Circuit has held that the Executive cannot use general exclusionary powers conferred by Congress to circumvent a specific INA provision without showing a threat to public interest, welfare, safety or security that was independent of the specific provision. *Abourezk*, 785 F.2d at 1057–58. The *Abourezk* court reasoned that the Executive's use of the general exclusionary provision to deny entry to members of groups proscribed in the specific provision would "rob [the general provision] of its independent scope and meaning," render the specific provision superfluous, and conflict with limits that Congress imposed on the use of the specific provision. *Id.* at 1057. We agree with the D.C. Circuit's approach and apply it to § 1182(f).

We conclude that the Proclamation conflicts with the statutory framework of the INA by indefinitely nullifying Congress's considered judgments on matters of immigration. The Proclamation's stated purposes are to prevent entry of terrorists

and persons posing a threat to public safety, as well as to enhance vetting capabilities and processes to achieve that goal. *See* 82 Fed. Reg. at 45,161. Yet Congress has already acted to effectuate these purposes.

As for the prevention of entry of terrorists and persons likely to pose public-safety threats, Congress has considered these concerns, and enacted legislation to restrict entry of persons on those specific grounds. Under 8 U.S.C. § 1182(a)(3)(B), any alien who has "engaged in a terrorist activity" is inadmissible,[13] unless the Secretary of State determines in his unreviewable discretion that the alien qualifies for a waiver. *See id.* § 1182(d)(3)(B). With regard to public safety, Congress has created numerous inadmissibility grounds, including an array of crime-related grounds. *See, e.g., id.* § 1182(a)(2)(A) (crime of moral turpitude or drug offense); § 1182(a)(2)(B) (two or more offenses for which the aggregate sentences were five years or more); § 1182(a)(2)(C) (drug trafficking or benefitting from a relative who recently trafficked drugs); § 1182(a)(2)(D) (prostitution or "commercialized vice"); § 1182(a)(2)(H) (human trafficking); § 1182(a)(2)(I) (money laundering); § 1182(a)(3) ("Security and related grounds").

---

[13] The term "engaged in a terrorist activity" is comprehensive. For example, "terrorist activity" includes any unlawful use of a weapon or dangerous device "other than for mere personal monetary gain," and "[e]ngag[ing] in terrorist activity" includes providing "material support" for any "terrorist activity" or terrorist organization. *See* 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(bb), (a)(3)(B)(iv).

32

With respect to the enhancement of vetting capabilities and processes, we likewise conclude that Congress has considered the reality that foreign countries vary with respect to information-sharing and identity-management practices, as well as terrorism risk. In fact, Congress addressed those concerns in a neighboring section, 8 U.S.C. § 1187 (the Visa Waiver Program or "VWP"), which was amended as recently as 2015 to address the heightened risk of terrorism in certain countries. *See* Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015, Pub. L. No. 114-113, § 203, 129 Stat. 2242, 2989–91. Significantly, many of the criteria used to determine whether a foreign national's country of origin qualifies for VWP treatment are replicated in the Proclamation's list of baseline criteria. This includes that the countries use electronic passports, § 1187(a)(3)(B), report lost or stolen passports, § 1187(c)(2)(D), and not provide safe haven for terrorists, § 1187(a)(12)(D)(iii). *See* 82 Fed. Reg. 45,162. The Proclamation even makes participation in the Visa Waiver Program part of its criteria for evaluating countries. *Id.* at 45,162–63.

The Government argues that the Visa Waiver Program is irrelevant because its "specific purpose" is the "facilitation of travel," and therefore it does not foreclose the President from addressing the "separate issue of what to do about a country that fails so many criteria that its information-sharing practices and other risk factors are collectively inadequate." This argument falls short. The Visa

33

Waiver Program's travel facilitation purpose is notable, but not for the reason advanced by the Government. As we explained above, the Visa Waiver Program utilizes many of the same criteria relied upon by the Proclamation. Congress thus expressly considered the reality that countries vary with respect to information-sharing and identity-management practices, as well as terrorism risk. In response to that reality, Congress could have enacted measures restricting travel from countries with inadequate risk factors, taken no action, or enacted provisions facilitating travel from low-risk countries. In creating the Visa Waiver Program, Congress chose the third approach. In so doing, Congress necessarily determined that the interests of the United States would be better served by facilitating *more* travel, not less. By heavily restricting travel from the affected countries, the Proclamation thus conflicts with the purpose of the Visa Waiver Program.

More broadly, the Government contends that Plaintiffs' reliance on the statutory framework is misplaced because § 1182(f) empowers the President to issue "*supplemental*" admission restrictions when he finds that the national interest so warrants. Although true, this merely begs the question of whether the restrictions at issue here are "supplemental." We conclude that the indefinite suspension of entry of all nationals from multiple countries, absent wartime or exigent circumstances, nullifies rather than "supplement[s]" the existing statutory scheme. The President is not foreclosed from acting to enhance vetting capabilities

and other practices in order to strengthen existing immigration law, but must do so in a manner consistent with Congress's intent. Put another way, the President cannot effectively abrogate existing immigration law while purporting to merely strengthen it; the cure cannot be worse than the disease. Here, the President has used his § 1182(f) and § 1185(a) powers to nullify numerous specific provisions of the INA indefinitely with regard to all nationals of six countries, and has overridden Congress's legislative responses to the same concerns the Proclamation aims to address. The Executive cannot without assent of Congress supplant its statutory scheme with one stroke of a presidential pen.

### c. Legislative History

The legislative history suggests further limitations on § 1182(f)'s broad grant of authority. Prior to passing the INA, which included § 1182(f), the House of Representatives debated an amendment that would have continued to restrict the President's authority to suspend immigration only "[w]hen the United States is at war or during the existence of a national emergency proclaimed by the President." 98 Cong. Rec. 4423 (statement of Rep. Multer).[14] Speaking in opposition to the

---

[14] Section 1182(f)'s 1941 predecessor limited the president's authority to suspend entry of aliens only to times of war or national emergency. *See* Act of June 21, 1941, 55 Stat. 252, 252–53. In anticipation of future immigration reform, the Senate Committee on the Judiciary published a comprehensive report in 1950 on the state of immigration laws in the country. *See* S. Rep. No. 81-1515, at 1–2 (1950). Although the report states that the committee was considering a provision that would "permit the President to suspend any and all immigration whenever he

35

ultimately unsuccessful amendment, the sponsor of the bill urged that § 1182(f)'s

broad language was "absolutely essential," because

> [W]hen there is an outbreak of an epidemic in some country, whence these people are coming, it is *impossible* for Congress to act. People might conceivably in large numbers come to the United States and bring all sorts of communicable diseases with them. More than that, suppose we have a period of great unemployment? In the judgment of the committee, it is advisable at such times to permit the President to say that for a certain time we are not going to aggravate that situation.

 *Id.* (statement of Rep. Walter) (emphasis added).

Although Representative Walter and the bill's supporters did not "intend[]

[their] list of examples to be exhaustive," *Pension Benefit Guaranty Corp. v. LTV

Corp.*, 496 U.S. 633, 649 (1990), "it is significant that the example[s] Congress did

give" all share the common trait of exigency. *Moran v. London Records, Ltd.*, 827

F.2d 180, 183 (7th Cir. 1987). Proponents of § 1182(f) deliberately pinned the

provision to examples where it would be difficult, if not impossible, for Congress

to react in a timely manner, thus necessitating swift presidential action.[15] The

---

finds such action to be desirable in the best interests of the country," it is unclear whether the report's brief statement was in reference to what would eventually become § 1182(f) two years later. *Id.* at 381. More importantly, as Plaintiffs point out, none of the bill's supporters affirmatively voiced such a broad interpretation of § 1182(f) when pressed on the matter by members of the opposition.

[15] We note that hearings in 1970 and 1977 produced testimony from the Department of State that § 1182(f) (or § 212(f) of the INA) could be traced to "health prohibitions" even though the text does not explicitly limit executive use to exigencies, health or otherwise. *See, e.g.*, *United States-South African Relations: South Africa's Visa Policy: Hearing Before the Subcomm. on Africa & Int'l Org. of

legislative history, then, suggests that despite § 1182(f)'s facially broad grant of power,[16] the Proclamation—which cites to no exigencies, national or otherwise, and does not respond to a situation Congress would be ill-equipped to address— falls outside of the boundaries Congress set.

### d. Prior Executive Practice

*the Comm. on Int'l Relations H. Rep.*, 95th Cong. 10–11 (1977) (statement of Hon. Barbara M. Watson, Administrator, Bureau of Security and Consular Affairs, Dep't of State).  Considering the strength of legislative history supporting use of § 1182(f) to restrict entry during epidemics, it is noteworthy that a 2014 Congressional Research Service report cautioned that the provision could only "potentially" be used to prevent entry of "foreign nationals traveling from a particular country or region from which there has been an Ebola outbreak."  *See* Sarah A. Lister, *Preventing the Introduction and Spread of Ebola in the United States: Frequently Asked Questions*, Cong. Res. Serv. 3 (Dec. 5, 2014).  The report noted that § 1182(f) had "never been employed so broadly" before.  *Id.*

[16] Several congressmen did express concerns prior to enactment that § 1182(f) would give the President "an untrammeled right, an uninhibited right to suspend immigration entirely."  98 Cong. Rec. 4423 (statement of Rep. Celler).  Their "fears and doubts," however, "are no authoritative guide to the construction of legislation[,] [because] [i]n their zeal to defeat a bill, [opponents to a bill] understandably tend to overstate its reach."  *Bryan v. United States*, 524 U.S. 184, 196 (1998) (internal citations and quotation marks omitted).

Moreover, there is some evidence that supporters of § 1182(f) and its predecessor provision believed the opposition's concerns unreasonably presumed executive abuse of power.  *See* 87 Cong. Rec. 5049 (1941) (statement of Rep. Bloom) (dismissing a representative's concerns because "the gentleman is figuring on something that the President would not do"); *see also* 98 Cong. Rec. 4424 (statement of Rep. Halleck) ("I take it that the gentleman would not be concerned [about section 1182(f)] if he were sure he would always have a President that could not do any wrong").

Notwithstanding the aforementioned factors, the Government argues that "[h]istorical practice confirms the breadth of, and deference owed to, the President's exercise of authority under Sections 1182(f) and 1185(a)(1)." We pass no judgment on the legality or appropriateness of the Executive's past practice, but we consider such practice to the extent it bears on congressional acquiescence. *See Abourezk*, 785 F.2d at 1055 ("[E]vidence of congressional acquiescence (or the lack thereof) in an administrative construction of the statutory language during the thirty-four years since the current act was passed could be telling."); *see also Zemel v. Rusk*, 381 U.S. 1, 17–18 (1965) ("We have held . . . and reaffirm today, that the 1926 [Passport] Act must take its content from history: it authorizes only those passport refusals and restrictions 'which it could fairly be argued were adopted by Congress in light of prior administrative practice.'" (quoting *Kent v. Dulles*, 357 U.S. 116, 128 (1958))).

The Government is correct that presidents have suspended the entry of foreign nationals in various foreign policy and national security settings, but we nevertheless conclude that the Proclamation and its immediate predecessors, EO-1 and EO-2, stand apart in crucial respects. First, out of the forty-three proclamations or orders issued under § 1182(f) prior to EO-1, forty-two targeted only government officials or aliens who engaged in specific conduct and their associates or relatives. *See* Kate M. Manuel, Cong. Research Serv., R44743,

38

*Executive Authority to Exclude Aliens: In Brief* 6–10, (2017) (listing prior §

1182(f) proclamations and orders).

Only one § 1182(f) proclamation suspended entry of all nationals of a

foreign country. Proclamation 5517, issued in 1986, suspended entry of Cuban

nationals as immigrants in response to the Cuba government's own suspension of

"all types of procedures regarding the execution" of an immigration agreement

between the United States and Cuba. 51 Fed. Reg. 30,470 (Aug. 22, 1986). In

addition, President Carter delegated authority under § 1185(a) to the Secretary of

State and the Attorney General to prescribe limitations governing the entry of

Iranian nationals, but did not ban Iranian immigrants outright. *See* Exec. Order

12172, 44 Fed. Reg. 67,947 (Nov. 26, 1979), *amended by* Exec. Order 12206, 45

Fed. Reg. 24,101 (Apr. 7, 1980). These isolated instances, which applied to a

single country each and were never passed on by a court, cannot sustain the weight

placed on them by the Government. *See Solid Waste Agency of N. Cook Cty. v.

U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001) ("Although we have

recognized congressional acquiescence to administrative interpretations of a statute

in some situations, we have done so with extreme care.").

Moreover, unlike the Proclamation, the Cuba and Iran orders were intended

to address specific foreign policy concerns distinct from general immigration

concerns already addressed by Congress. The same holds true for the vast majority

39

of prior § 1182(f) suspensions.  *See, e.g.*, Executive Order 13606, 77 Fed. Reg. 24,571 (Apr. 22, 2012) (suspending entry of persons who facilitated cyber-attacks and human rights abuses by the Syrian or Iranian governments); Proclamation 6925, 61 Fed. Reg. 52,233 (Oct. 3, 1996) (suspending entry of persons "who formulate, implement, or benefit from policies that impede Burma's transition to democracy, and the immediate family members of such persons"); Proclamation 6569, 58 Fed. Reg. 31,897 (June 3, 1993) (suspending entry of persons "who formulate, implement, or benefit from policies that impede the progress of the negotiations designed to restore constitutional government to Haiti, and the immediate family members of such persons").

The only prior entry suspension lacking a foreign policy or national security purpose distinct from general immigration concerns is found in President Reagan's High Seas Interdiction Proclamation and its implementing executive orders.  That Proclamation suspended "entry of undocumented aliens from the high seas" and ordered that such entry "be prevented by the interdiction of certain vessels carrying such aliens."  Proclamation 4865, 46 Fed. Reg. 48,107 (Sep. 29, 1981).  Consequently, Proclamation 4865 and its implementing executive orders, unlike the present Proclamation, applied by their terms almost entirely to aliens who were

40

already statutorily inadmissible.[17] *See id.*; Exec. Order 12324, 46 Fed. Reg. 48,109 (Sep. 29, 1981); Exec. Order 12807, 57 Fed. Reg. 23,133 (May 24, 1992).

We recognize that presidents ordinarily may use—and have used—§ 1182(f) to suspend the entry of aliens who might otherwise be admissible under the INA. But when, as here, a presidential proclamation addresses only matters of immigration already passed upon by Congress, the President's § 1182(f) authority is at its nadir.

The High Seas Interdiction suspensions are consistent with this principle because they apply predominantly to otherwise inadmissible aliens. In contrast, by suspending entry of a class of 150 million potentially admissible aliens, the Proclamation sweeps broader than any past entry suspension and indefinitely nullifies existing immigration law as to multiple countries. The Proclamation does so in the name of addressing general public-safety and terrorism threats, and what it deems to be foreign countries' inadequate immigration-related practices— concerns that Congress has already addressed.

---

[17] Under 8 U.S.C. § 1182(a)(7)(A)(i)(I), an alien who does not possess "a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document" is inadmissible. The High Seas Interdiction suspensions did, however, affect some aliens who could have become admissible insofar as the suspensions prevented refugees fleeing persecution from reaching United States territorial waters. *See Sale*, 509 U.S. at 187–88 (holding that barring the entry of refugees outside the territorial waters of the United States did not violate the INA or the United Nations Convention Relating to the Status of Refugees).

41

We conclude that the Executive's past practice does not support the Government's position. Instead, such practice merely confirms that the Proclamation, like EO-2, "is unprecedented in its scope, purpose, and breadth." *Hawai'i I*, 859 F.3d at 779.

### e. Constitutional Avoidance and Separation of Powers

Principles of separation of powers further compel our conclusion that the Proclamation exceeds the scope of authority delegated to the President under § 1182(f). It is a bedrock principle of statutory interpretation that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *see also INS v. St. Cyr*, 553 U.S. 289, 300 (2001) ("[W]e are obligated to construe the statute to avoid [serious constitutional] problems."). Here, a conclusion that the Proclamation does not exceed the President's delegated authority under § 1182(f) would raise "serious constitutional problems" and should thus be avoided. *See DeBartolo*, 485 U.S. at 575. Reading § 1182(f) to permit the Proclamation's sweeping exercise of authority would effectively render the statute void of a requisite "intelligible principle" delineating the "general policy" to be applied and "the boundaries of th[e] delegated authority," *Mistretta v. United*

42

*States*, 488 U.S. 361, 372–73 (1989).  Without any meaningful limiting principles,[18] the statute would constitute an invalid delegation of Congress's "exclusive[]" authority, *Galvan*, 347 U.S. at 531, to formulate policies regarding the entry of aliens.

As discussed above, the Proclamation functions as an executive override of broad swaths of immigration laws that Congress has used its considered judgment to enact.  If the Proclamation is—as the Government contends—authorized under § 1182(f), then § 1182(f) upends the normal functioning of separation of powers.  Even Congress is prohibited from enabling "unilateral Presidential action that either repeals or amends parts of duly enacted statutes."  *Clinton v. City of New York*, 524 U.S. 417, 439 (1998).  This is true even when the executive actions respond to issues of "first importance," issues that potentially place the country's "Constitution and its survival in peril."  *Id.* at 449 (Kennedy, J., concurring).  In addressing such critical issues, the political branches still do not "have a somewhat free hand to reallocate their own authority," as the "Constitution's structure requires a stability which transcends the convenience of the moment" and was crafted in recognition that "[c]oncentration of power in the hands of a single branch is a threat to liberty."  *Id.* at 449–50.

---

[18] These limiting principles are primarily found in the text of the statute, but also include the surrounding statutory framework, the legislative history, and prior executive practice.

And the Proclamation's sweeping assertion of authority is fundamentally legislative in nature. Where an action "ha[s] the purpose and effect of altering the legal rights, duties and relations of persons, including the Attorney General, Executive Branch officials and [an alien], all outside the legislative branch," the Supreme Court has held that the action is "essentially legislative in purpose and effect" and thus cannot bypass the "single, finely wrought and exhaustively considered, procedure" for enacting legislation.[19] *INS v. Chadha*, 462 U.S. 919, 951–52 (1983). Here, the Proclamation does not merely alter the "legal rights, duties and relations" of a single alien, *id.* at 952, but rather affects the rights, duties and relations of countless American citizens and lawful permanent residents whose ability to be reunified with, and receive visits from, their family members is inhibited by the Proclamation; the Proclamation also significantly affects numerous officials within the Department of Homeland Security and Department of State. Whereas the House's action in *Chadha* "operated . . . to overrule the Attorney General," *id.*, here the Proclamation would operate to overrule Congress's "extensive and complex" scheme of immigration laws, *Arizona*, 567 U.S. at 395, as

---

[19] Although the Government has not explained why the President has thus far failed to ask Congress to enact the Proclamation's policies by legislation, potential congressional inaction cannot sustain the President's authority to issue the Proclamation, as "[f]ailure of political will does not justify unconstitutional remedies" like violating the Constitution's separation of powers. *Clinton v. City of New York*, 524 U.S. at 499 (Kennedy, J., concurring).

they pertain to the eight affected countries and the over 150 million affected individuals.

Decades of Supreme Court precedent support reading meaningful limitations into § 1182(f) in order to avoid striking down the statute itself as an unconstitutional delegation. For example, in *Zemel v. Rusk*, the Court opted to read in limiting principles despite statutory language that, on its face, appeared to grant the Executive complete discretion: "The Secretary of State may grant and issue passports under such rules as the President shall designate and prescribe for and on behalf of the United States." 381 U.S. at 7–8, 17. By so doing, the Court saved the statute from constituting "an invalid delegation." *Id.* at 18. The Court noted that principles of separation of powers still apply even in the field of foreign relations, holding that "simply because a statute deals with foreign relations" does not mean that the statute "can grant the Executive totally unrestricted freedom of choice." *Id.* at 17. Similarly, in *United States v. Witkovich*, the Court—faced with statutory language that "if read in isolation and literally, appears to confer upon the Attorney General unbounded authority"—nonetheless adopted a more "restrictive meaning" in order to avoid the "constitutional doubts" implicated by a "broader meaning." 353 U.S. at 199.

To avoid the inescapable constitutional concerns raised by the broad interpretation the Government urges us to adopt, we interpret § 1182(f) as

45

containing meaningful limitations—limitations that the Proclamation, in effectively rewriting the immigration laws as they pertain to the affected countries, exceeds. After all, "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Zivotofsky ex rel. Zivotofsky v. Kerry,* 135 S. Ct. 2076, 2090 (2015).

## 2. Compliance with § 1182(f)

We next turn to whether, even assuming the President did not exceed the scope of his delegated authority under § 1182(f), the Proclamation meets § 1182(f)'s requirement that the President find that the entry of certain persons "would be detrimental to the interests of the United States" prior to suspending their entry. 8 U.S.C. § 1182(f).

Although we considered this question in *Hawai'i I* and ultimately answered it in the negative, 859 F.3d at 770–74, the Proclamation differs from EO-2 in several ways. As we discussed above, the Proclamation's suspensions of entry apply indefinitely, rather than for only 90 days. Unlike EO-2, the Proclamation developed as a result of a multi-agency review. The justifications for the Proclamation are different, too. The Proclamation puts forth a national security interest in information sharing between other countries and the United States, explains that it imposes its restrictions as an incentive for other countries to meet the United States' information-sharing protocols, and identifies "tailored"

46

restrictions for each designated country. And the list of affected countries differs

from EO-2's: the Proclamation adds Chad, removes Sudan, and includes two non-

majority Muslim countries, North Korea and Venezuela.

Although there are some differences between EO-2 and the Proclamation,

these differences do not mitigate the need for the President to satisfy § 1182(f)'s

findings requirement. Despite our clear command in *Hawai'i I*, the

Proclamation—like EO-2—fails to "provide a rationale explaining why permitting

entry of nationals from the six designated countries under current protocols would

be detrimental to the interests of the United States." *Id.* at 773. In assessing the

scope of the President's statutory authority, we begin with the text. The relevant

portion of § 1182(f) states:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

While § 1182(f) gives the President broad authority to suspend or place

restrictions on the entry of aliens or classes of aliens, this authority is not

unlimited. Section 1182(f) expressly requires that the President *find* that the entry

of a class of aliens would be *detrimental* to the interests of the United States before

the aliens in a class are excluded. The use of the word "find" was deliberate.

47

Congress used "find" rather than "deem" in the immediate predecessor to § 1182(f) so that the President would be required to "base his [decision] on some fact," not on mere "opinion" or "guesses." 87 Cong. Rec. 5051 (1941) (statements of Rep. Jonkman and Rep. Jenkins).

By contrast, the Proclamation summarily concludes: "[A]bsent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in section 2 of this proclamation would be detrimental to the interests of the United States." 82 Fed. Reg. 45,161–62. The Proclamation points out that screening and vetting protocols enhance the Government's ability to "detect foreign nationals who may commit, aid, or support acts of terrorism and other public-safety threats." *Id*. at 45,162. It then asserts that the travel restrictions will encourage the targeted foreign governments to improve their information-sharing and identity-management protocols and practices. The degree of desired improvement is left unstated; there is no finding that the present vetting procedures are inadequate or that there will be harm to our national interests absent the Proclamation's issuance.

In assessing the merits of Plaintiffs' motion for a preliminary injunction, the district court considered whether the Government had made the requisite findings for the President to suspend the entry of aliens under § 1182(f). Relying on our decision in *Hawai'i I*, the district court concluded that the Government had not.

48

*Hawaiʻi TRO*, 2017 WL 4639560, at \*9–10.  Although our prior decision in

*Hawaiʻi I* has since been vacated as moot, the Supreme Court "express[ed] no view

on the merits" in ordering vacatur.  *Trump*, 2017 WL 4782860, at \*1.  We

therefore adopt once more the position we articulated in *Hawaiʻi I* that § 1182(f)

requires entry suspensions to be predicated on a finding of detriment to the United

States.  859 F.3d at 773.

The Government argues that the "detailed findings" in the Proclamation

satisfy the standard we set forth in *Hawaiʻi I*.  Plaintiffs respond that the findings

were inadequate because § 1182(f) expressly requires (1) "'find[ings]' that support

the conclusion that admission of the excluded aliens would be 'detrimental,'" and

(2) "the harm the President identifies must amount to a 'detriment to the interests

of the United States.'"  We agree with Plaintiffs.

The Proclamation makes no finding whatsoever that foreign nationals'

nationality alone renders entry of this broad class of individuals a heightened

security risk to the United States.[20]  Nor does it contain a finding that the

nationality of the covered individuals alone renders their entry into the United

States on certain forms of visas detrimental to the interests of the United States.

As such, there is no stated connection between the scope of the restriction imposed

---

[20] Rather, a declaration from former national security advisors—quoting a study from the Department of Homeland Security—states: "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity."

49

and a finding of detriment that the Government seeks to alleviate. While the district court may have imprecisely stated that the Proclamation was "unsupported by verifiable evidence," *Hawaiʻi TRO*, 2017 WL 4639560, at *11, it was correct in concluding that the stated findings do not satisfy § 1182(f)'s prerequisites.

To be sure, the Proclamation does attempt to rectify EO-2's lack of a meaningful connection between listed countries and terrorist organizations. For instance, it cites to the fact that "several terrorist groups are active" in Chad. 82 Fed. Reg. at 45,165. But the Proclamation does not tie the nationals of the designated countries to terrorist organizations. For the second time, the Proclamation makes no finding that nationality alone renders entry of this broad class of individuals a heightened security risk or that current screening processes are inadequate.[21]

National security is not a "talismanic incantation" that, once invoked, can support any and all exercise of executive power under § 1182(f). *United States v. Robel*, 389 U.S. 258, 263–64 (1967). Section 1182(f) requires that the President make a finding that the entry of an alien or class of aliens *would be* detrimental to the interests of the United States. That requirement has not been met.

---

[21] As the statistics provided by the Cato Institute demonstrate, no national from any of the countries selected has caused any of the terrorism-related deaths in the United States since 1975. *See* Brief of the Cato Institute as Amicus Curiae, Dkt. No. 84 at 26–28.

The Government argues that the district court erred by imposing a higher standard than that set forth in *Hawai'i I* by objecting to the President's stated reasons for the ban, by identifying internal inconsistencies, and by requiring verifiable evidence. We need not address the Government's argument because, as discussed above, the Proclamation has failed to make the critical finding that § 1182(f) requires. We therefore hold that Plaintiffs have shown a likelihood of success on the merits of their § 1182(f) claim that the President has failed to make an adequate finding of detriment.

### 3. Section 1185(a)

In addition to relying on § 1182(f), the Proclamation also grounds its authority in 8 U.S.C. § 1185(a), which states:

> Unless otherwise ordered by the President, it shall be unlawful [] for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1).

The Government does not argue that § 1185(a) provides an independent basis to suspend entry. Instead, the Government contends that § 1185(a) permits the President to skirt the requirements of § 1182(f) because § 1185(a) does not require a predicate finding before the President prescribes reasonable rules, regulations, and orders governing alien entry and departure. The Government also

51

argues that there is no meaningful standard for review because these matters are committed to the President's judgment and discretion. Plaintiffs respond that the Government cannot use the general authority in § 1185(a) to avoid the preconditions of § 1182(f).

We conclude that the Government cannot justify the Proclamation under § 1182(f) by using § 1185(a) as a backdoor. General grants in a statute are limited by more specific statutory provisions, and § 1182(f) has a specific requirement that there be a finding of detriment before entry may be suspended or otherwise restricted. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general." (internal quotation marks and alterations omitted)). Section 1185(a) does not serve as a ground for reversal of the district court's conclusion on Plaintiffs' likelihood of success.

### 4. Section 1152(a)(1)(A)'s Prohibition on National Origin Discrimination

Next, we consider the impact of 8 U.S.C. § 1152(a)(1)(A) on the President's authority to issue the Proclamation. Section 1152(a) states:

> [N]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, *nationality*, place of birth, or place of residence.

8 U.S.C. § 1152(a)(1)(A) (emphasis added).

The Government argues that the district court erred by reading

§ 1152(a)(1)(A) to limit the President's authority under § 1182(f), and that

§ 1152(a)(1)(A) has never been used as a constraint on the President's authority

under § 1182(f).  In making this argument, the Government once again urges us to

conclude that § 1152(a)(1)(A) operates in a separate sphere from § 1182(f).  This

we decline to do.

Congress enacted § 1152(a)(1)(A) of the INA contemporaneously with the

Civil Rights Act of 1964 and the Voting Rights Act of 1965 to eliminate the

"national origins system as the basis for the selection of immigrants to the United

States."  H.R. Rep. No. 89-745, at 8 (1965).  In so doing, Congress manifested its

intent to repudiate a history of nationality and race-based discrimination in United

States immigration policy.[22]  *See* 110 Cong. Rec. 1057 (1964) (statement of Sen.

---

[22]  The discriminatory roots of the national origins system may be traced back to 1875, when xenophobia towards Chinese immigrants produced Congress's first race-based immigration laws.  *See* Brief of the National Asian Pacific American Bar Association as Amicus Curiae, Dkt. No. 126, at 5.  The Page Law, passed in 1875, banned immigration of women—primarily Asian women—who were presumed, simply by virtue of their ethnicity and nationality, to be prostitutes.  *Id.* at 5.  The Page Law was followed in quick succession by the Chinese Exclusion Act in 1882 and the Scott Act in 1888.  *Id.* at 6.  These laws were justified on security grounds.  *See Chae Chan Ping v. United States*, 130 U.S. 581, 606 (1889) (declining to overturn the Scott Act because "the government of the United States, through its legislative department, considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security.").  This underlying xenophobia eventually produced the national origins system, which clearly signaled that "people of some nations [were]

Hart) ("[A]n immigration policy with different standards of admissibility for different racial and ethnic groups, in short, a policy with build-in bias, is contrary to our moral and ethical policy."). Recognizing that "[a]rbitrary ethnic and racial barriers [had become] the basis of American immigration policy," Senator Hart, the bill's sponsor, declared that § 1152(a)(1)(A) was necessary "[t]o restore equality and fairplay in our selecting of immigrants." *Id.*

The Government argues that § 1152(a)(1)(A)'s prohibition of discrimination in the issuance of visas does not cabin the President's authority to regulate entry under § 1182(f). We disagree. As the Government concedes, the Proclamation restricts the entry of affected aliens *by precluding consular officers from issuing visas* to nationals from the designated countries. *See* 82 Fed. Reg. at 45,168. Put another way, the Proclamation effectuates its restrictions by withholding immigrant visas on the basis of nationality. This directly contravenes Congress's "unambiguous[] direct[ions] that no nationality-based discrimination . . . occur." *Legal Assistance for Vietnamese Asylum Seekers*, 45 F.3d at 473.

We are bound to give effect to "all parts of a statute, if at all possible." *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973). The Government's position that § 1152(a)(1)(A) and § 1182(f) operate in different

___

more welcome to America than others," and created "token quotas" based on "implications of race superiority." 110 Cong. Rec. 1057 (statement of Sen. Hart).

spheres—the former in issuance of immigrant visas, the latter in entry—would strip § 1152(a)(1)(A) of much of its power. It is difficult to imagine that Congress would have celebrated the passing of the bill as "one of the most important measures treated by the Senate . . . [for its] restate[ment] [of] this country's devotion to equality and freedom" had it thought the President could simply use § 1182(f) to bar Asian immigrants with valid immigrant visas from entering the country. 111 Cong. Rec. 24785 (1965) (statement of Sen. Mansfield); *see also* Lyndon B. Johnson, *Remarks at the Signing of the Immigration Bill, Liberty Island, New York,* The Am. Presidency Project (Oct. 3, 1965), http://www. presidency.ucsb.edu/ws/index.php?pid=27292 (concluding that the discriminatory national origins quota system "will never again shadow the gate to the American Nation with the twin barriers of prejudice and privilege").

We do not think Congress intended § 1152(a)(1)(A) to be so easily circumvented. We therefore read § 1152(a)(1)(A) as prohibiting discrimination on the basis of nationality *throughout* the immigration visa process, including visa issuance and entry. [23]

---

[23] Even if we assume for the sake of argument that Congress intended § 1182(f) and § 1152(a)(1)(A) to operate in entirely separate spheres, as is argued by the Government, the result would be the same. This is so because both at oral argument and in the Proclamation's text, the Government has conceded that if its entry ban were upheld, all embassy actions in issuing visas for nationals of the precluded countries would cease. 82 Fed. Reg. at 45,168 (noting that waiver by consular officers will be effective "both for *the issuance of a visa and for any*

55

To the extent that § 1152(a)(1)(A) conflicts with the broader grant of authority in § 1182(f) and § 1185(a), the Government asks us to give the latter two provisions superseding effect. The Government argues that as the more recently amended and "more specific" provision, § 1185(a) ought to control over § 1152(a)(1)(A). We are unpersuaded by this argument for several reasons.

First, when two statutory provisions are in irreconcilable conflict, a later-enacted, more specific provision is treated as an exception to an earlier-enacted, general provision. *See, e.g.*, *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 (9th Cir. 2016); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 183–87 (2012). Section 1152(a)(1)(A) was enacted over a decade after § 1182(f). Section 1152(a)(1)(A) also operates at a greater level of specificity than either § 1182(f) or § 1185(a)—it eliminates nationality-based discrimination for the issuance of immigrant visas. Because the "specific provision is construed as an exception to the general one," we agree with Plaintiffs that § 1152(a)(1)(A) provides a specific anti-discrimination bar to the President's general § 1182(f) powers. *RadLAX*, 566 U.S. at 645.

---

*subsequent entry on that visa*" (emphasis added)); United States Court of Appeals for the Ninth Circuit, *17-17168 State of Hawaii v. Donald Trump*, YouTube (Dec. 7, 2017) at 9:55–11:33; 11:59–12:12. Enforcement of the entry ban under § 1182(f) would inescapably violate § 1152(a)(1)(A)'s prohibition on nationality-based discrimination in the issuance of immigrant visas, because the Proclamation effectively bars nationals of the designated countries from receiving immigrant visas.

Second, § 1152(a)(1)(A) clearly provides for exceptions in a number of circumstances. *See* 8 U.S.C. §§ 1101(a)(27), 1151(b)(2)(A)(i), and 1153. Neither § 1182(f) nor § 1185(a) is included in the list of enumerated exceptions. We presume that Congress's inclusion of specified items and exclusion of others is intentional. *See United States v. Vance Crooked Arm*, 788 F.3d 1065, 1075 (9th Cir. 2015) ("Under the longstanding canon *expressio unius est exclusio alterius*, we presume that the exclusion of . . . phrases" by Congress was intentional). The conspicuous absence of § 1182(f) and § 1185(a) from the listed exceptions vitiates the Government's position that both provisions fall outside § 1152(a)(1)(A)'s purview.

Lastly, the Government's reliance on prior Executive practice is misplaced. The Government again points to President Reagan's Proclamation 5517 suspending immigration from Cuba in response to Cuba's own suspension of immigration practices, and President Carter's Executive Order 12172 and the accompanying visa issuance regulations as to Iranian nationals during the Iran hostage crisis. As we explained above, *supra* at § III.A.1.d, those restrictions were never challenged in court and we do not pass on their legality now. Moreover, both orders are outliers among the forty-plus presidential executive orders restricting entry, and therefore cannot support a showing of congressional acquiescence. *See Solid Waste Agency*, 531 U.S. at 169. Finally, we need not

57

decide whether a President may, under special circumstances and for a limited time, suspend entry of all nationals from a foreign country. *See IRAP v. Trump*, No. TDC-17-0361, 2017 WL 4674314, at *21 (D. Md. Oct. 17, 2017). Such circumstances, if they exist, have not been argued here.

For the reasons stated above, the Proclamation's indefinite entry suspensions constitute nationality discrimination in the issuance of immigrant visas. We therefore conclude that Plaintiffs have shown a likelihood of success on the merits of their claim that the Proclamation runs afoul of § 1152(a)(1)(A)'s prohibition on nationality-based discrimination.

### 5. Alternative Authority

Having concluded that the Proclamation violates the INA and exceeds the scope of the President's delegated authority under § 1182(f), we view the Proclamation as falling into Justice Jackson's third category from *Youngstown Sheet & Tube Co. v. Sawyer*: "[w]hen the President [has] take[n] measures incompatible with the expressed or implied will of Congress." 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Under *Youngstown*'s tripartite framework, presidential actions that are contrary to congressional will leave the President's "power [] at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* We therefore must determine whether the President has constitutional authority to issue

58

the Proclamation, independent of any statutory grant—for if he has such power, it may be immaterial that the Proclamation violates the INA. But when a President's action falls into "this third category, the President's asserted power must be both 'exclusive' and 'conclusive' on the issue" in order to succeed. *Zivotofsky ex rel. Zivotofsky*, 135 S. Ct. at 2084.

We conclude that the President lacks independent constitutional authority to issue the Proclamation, as control over the entry of aliens is a power within the exclusive province of Congress.[24] *See Galvan*, 347 U.S. at 531 ("[T]he formulation of these [immigration] policies is entrusted exclusively to Congress"); *see also Arizona*, 567 U.S. at 407 (citing *Galvan*, 347 U.S. at 531). While the Supreme Court's earlier jurisprudence contained some ambiguities on the division of power between Congress and the Executive on immigration,[25] the Court has

---

[24] In *Hawai'i I*, we opted not to decide the question of "whether and in what circumstances the President may suspend entry under his inherent powers as commander-in-chief or in a time of national emergency." 859 F.3d 741, 782 n.21 (9th Cir. 2017). In holding today that the President lacked independent constitutional authority to issue the Proclamation, we again need not, and do not, decide whether the President may be able to suspend entry pursuant to his constitutional authority under *any* circumstances (such as in times of war or national emergency), as the Proclamation was issued under no such exceptional circumstances.

[25] *See* Adam B. Cox & Cristina M. Rodriguez, *The President and Immigration Law*, 119 Yale L.J. 458, 467–482 (2009) (examining the Supreme Court's shift from viewing authority over immigration as ambiguously belonging to the political branches—without specifying the allocation of power between the two—to increasingly identifying control over immigration as the province of Congress).

more recently repeatedly recognized congressional control over immigration policies. *See, e.g.*, *Chadha*, 462 U.S. at 940 ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question"); *Fiallo*, 430 U.S. at 793 (recognizing "the need for special judicial deference to congressional policy choices in the immigration context"); *Galvan*, 347 U.S. at 531–32 ("[T]hat the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government . . . . [we] must therefore under our constitutional system recognize congressional power in dealing with aliens.").

Exclusive congressional authority over immigration policy also finds support in the Declaration of Independence itself, which listed "obstructing the Laws for Naturalization of Foreigners" and "refusing to pass [laws] to encourage their migrations hither" as among the acts of "absolute Tyranny" of "the present King of Great Britain." The Declaration of Independence para. 2 (U.S. 1776). As Justice Jackson noted in *Youngstown*, "The example of such unlimited executive power that must have most impressed the forefathers was the prerogative exercised by George III, and the description of its evils in the Declaration of Independence leads me to doubt that they were creating their new Executive in his image." 343 U.S. at 641 (Jackson, J., concurring). This is perhaps why the Constitution vested Congress with the power to "establish an uniform Rule of Naturalization": the

Framers knew of the evils that could result when the Executive exerts authority over the entry of aliens, and so sought to avoid those same evils by granting such powers to the legislative branch instead. *See* U.S. Const. art. I, § 8, cl. 4.

## B. Remaining Preliminary Injunction Factors

The three remaining preliminary injunction factors also lead us to affirm the preliminary injunction. Plaintiffs have successfully shown that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that the preliminary injunction is in the public interest. *Winter*, 555 U.S. at 20.

## 1. Irreparable Harm

The Government argues that Plaintiffs will suffer "no cognizable harm" absent the injunction because the Proclamation may only "delay" their relatives, students and faculty, and members from entering the United States. Indefinite delay, however, can rise to the level of irreparable harm. *See, e.g., CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) (Blackmun, J., in chambers) (granting emergency stay from preliminary injunction because the "indefinite delay" of a broadcast would cause "irreparable harm to the news media"). This is one such instance.

Plaintiffs have presented evidence that the Proclamation will result in "prolonged separation from family members, constraints to recruiting and retaining

61

students and faculty members to foster diversity and quality within the University community, and the diminished membership of the Association," the last of which "impacts the vibrancy of [the Association's] religious practices and instills fear among its members." *Hawaiʻi TRO*, 2017 WL 4639560, at *13. As we have said before, "[m]any of these harms are not compensable with monetary damages and therefore weigh in favor of finding irreparable harm." *Hawaiʻi I*, 859 F.3d at 782–83; *see also Washington*, 847 F.3d at 1168–69 ("[T]he States contend that the travel prohibitions harmed the States' university employees and students, separated families, and stranded the States' residents abroad."); *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (characterizing the "collateral harms to children of detainees whose parents are detained" as an irreparable harm); *Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*, 747 F.2d 511, 520 (9th Cir. 1984) (crediting intangible harms such as the "impairment of their ongoing recruitment programs [and] the dissipation of alumni and community goodwill and support garnered over the years"); *cf. Moore v. East Cleveland*, 431 U.S. 494, 503–04 (1977) (explaining that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition").

We therefore conclude that Plaintiffs are likely to suffer irreparable harm in the absence of the preliminary injunction.

## 2. Balance of Equities

We next conclude that the district court correctly balanced the equities in this case. When considering the equities of a preliminary injunction, we must weigh the "competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). In contrast to Plaintiffs' concrete allegations of harm, the Government cites to general national security concerns.[26] National security is undoubtedly a paramount public interest, *see Haig*, 453 U.S. at 307 ("[N]o governmental interest is more compelling than the security of the Nation."), but it cannot be used as a "talisman . . . to ward off inconvenient claims." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017); *cf. New York Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring) (describing "security" as a "broad, vague generality whose contours should not be invoked to abrogate" the law). When, as here, the President has failed to make sufficient findings that the "entry of certain classes of aliens would be detrimental to the national interest," "we cannot conclude that national security interests outweigh the harms to Plaintiffs." *Hawai'i I*, 859 F.3d at 783.

---

[26] The Government additionally argues that "[t]he injunction . . . causes irreparable injury by invalidating an action taken at the height of the President's authority." Not so. For the reasons discussed earlier, by acting in a manner incompatible with Congress's will, the President's power here is "at its lowest ebb." *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring).

The injunction here would only preserve the status quo as it existed prior to the Proclamation while the merits of the case are being decided. We think it significant that the Government has been able to successfully screen and vet foreign nationals from the countries designated in the Proclamation under current law for years. *See* Brief of the Cato Institute as Amicus Curiae, Dkt. No. 84 at 26–27 (explaining that, from 1975 through 2017, "no one has been killed in a terrorist attack on U.S. soil by nationals from any of the eight Designated Countries"); *id.* at 29 (showing that the U.S. incarceration rate for persons born in the designated countries is lower than the U.S. incarceration rates for persons born in the U.S. or other non-U.S. countries). Accordingly, the balance of equities tips in Plaintiffs' favor.

### 3. Public Interest

Lastly, we consider whether Plaintiffs have successfully shown that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. We conclude that they have.

It is axiomatic that the President must exercise his executive powers lawfully. When there are serious concerns that the President has not done so, the public interest is best served by "curtailing unlawful executive action." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided court* 136 S. Ct. 2271 (2016). Amici provide further insight into the public interests that

64

would be served by sustaining the district court's injunction. They have furnished us with a plethora of examples, of which we highlight a few.

Amici persuasively cite to increased violence directed at persons of the Muslim faith as one of the Proclamation's consequences. *See* Brief of Civil Rights Organizations as Amici Curiae, Dkt. No. 52 at 19–23; Brief of Members of the Clergy et al. as Amici Curiae, Dkt. No. 97 at 29–32. Amici also explain that by singling out nationals from primarily Muslim-majority nations, the Proclamation has caused Muslims across the country to suffer from psychological harm and distress, including growing anxiety, fear, and terror. Brief of Muslim Justice League et al. as Amici Curiae, Dkt. No. 68 at 21–23.

In assessing the public interest, we are reminded of Justice Murphy's wise words: "All residents of this nation are kin in some way by blood or culture to a foreign land." *Korematsu v. United States*, 323 U.S. 214, 242 (Murphy, J., dissenting). It cannot be in the public interest that a portion of this country be made to live in fear.

We note, too, that the cited harms are extensive and extend beyond the community. As Amici point out, the Proclamation, like its predecessors, "continues to disrupt the provision of medical care" and inhibits "the free exchange of information, ideas, and talent between the designated countries and [various] [s]tates, causing long-term economic and reputational damage." Brief of New

65

York et al. as Amici Curiae, Dkt. No. 71 at 4. Moreover, because the Proclamation bans the entry of potential entrepreneurs, inventers, and innovators, the public's interest in innovation is thwarted at both the state and corporate levels. *See* Brief of Technology Companies as Amici Curiae, Dkt. No. 99 at 5–7. The Proclamation further limits technology companies' abilities to hire to full capacity by barring nationals of the designed countries from filling vacant positions. *See* Brief of Massachusetts Technology Leadership Council as Amicus Curiae, Dkt. No. 120 at 8–16 (explaining that "the technology industry is growing too rapidly to be staffed through domestic labor alone").

The Proclamation also risks denying lesbian, gay, bisexual, transgender, and queer ("LGBTQ") individuals in the United States the opportunity to reunite with their partners from the affected nations. *See* Brief of Immigration Equality et al. as Amici Curiae, Dkt. No. 101 at 17–20. The Proclamation allows that it "may be appropriate" to grant waivers to foreign nationals seeking to reside with close family members in the United States. 82 Fed. Reg. at 45,168–69. But many of the affected nations criminalize homosexual conduct, and LGBTQ aliens will face heightened danger should they choose to apply for a visa from local consular officials on the basis of their same-sex relationships. Brief of Immigration Equality at 4. The public interest is not served by denying LGBTQ persons in the United States the ability to safely bring their partners home to them.

\* \* \*

For the foregoing reasons, we conclude that the district court did not abuse its discretion in granting an injunction.

## C. Scope of the Preliminary Injunction

The Government argues that the injunction is overbroad because it is not limited to redressing the Plaintiffs' "own cognizable injuries." Plaintiffs argue that the nationwide scope of the injunction is appropriate particularly in the immigration context because piecemeal relief would fragment immigration policy. Plaintiffs further argue that it would be impracticable or impossible for them to name all those who would apply to the University of Hawai'i or the Association, but who have been chilled or prevented by the Proclamation from doing so.

We review the scope of a preliminary injunction for abuse of discretion. *McCormack v. Hiedeman*, 694 F.3d 1004, 1010 (9th Cir. 2012). Although the district court has "considerable discretion in fashioning suitable relief and defining the terms of an injunction," *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991), there are limitations on this discretion. Injunctive relief must be "tailored to remedy the specific harm[s]" shown by the plaintiffs. *Id.*

Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights. *See Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) ("[A]n injunction is not necessarily

67

made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled.*"). "[T]he Constitution requires 'an *uniform* Rule of Naturalization'; Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*'; and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system.'" *Texas*, 809 F.3d at 187–88 (citations omitted). Any application of § 2 of the Proclamation would exceed the scope of § 1182(f), violate § 1152(a)(1)(A), and harm Plaintiffs' interests. Accordingly, the district court did not abuse its discretion by granting a nationwide injunction.

Although a nationwide injunction is permissible, a worldwide injunction as to all nationals of the affected countries extends too broadly. As the Supreme Court observed in *IRAP*: "The equities relied on by the lower courts do not balance the same way in that context." 137 S. Ct. at 2088. "[W]hatever burdens may result from enforcement of § 2(c) against a foreign national who lacks any connection to this country, they are, at a minimum, a good deal less concrete than the hardships identified [previously]." *Id.* "At the same time, the Government's interest in enforcing § 2(c), and the Executive's authority to do so, are undoubtedly at their peak when there is no tie between the foreign national and the United States." *Id.*

We therefore narrow the scope of the preliminary injunction, as we did in our November 13, 2017 order on the Government's motion for emergency stay. *See Hawai'i v. Trump*, 2017 WL 5343014, at *1. We then wrote:

> The preliminary injunction is stayed except as to "foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States," as set out below.

> The injunction remains in force as to foreign nationals who have a "close familial relationship" with a person in the United States. Such persons include grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins. "As for entities, the relationship must be formal, documented, and formed in the ordinary course, rather than for the purpose of evading [Proclamation 9645]."

*Id.* (internal citations omitted).

We again limit the scope of the district court's injunction to those persons who have a credible bona fide relationship with a person or entity in the United States. The injunction remains in force as to foreign nationals who have a "close familial relationship" with a person in the United States, including grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins. As for entities, the relationship must be formal, documented, and formed in the ordinary course of business, rather than for the purpose of evading the Proclamation.

## IV. Establishment Clause Claim

69

Plaintiffs argue that the Proclamation also violates the Establishment Clause of the United States Constitution. They urge us to adopt the view taken by the *en banc* Fourth Circuit in its review of EO-2 that "the reasonable observer would likely conclude that EO-2's primary purpose [was] to exclude persons from the United States on the basis of their religious beliefs." *IRAP*, 857 F.3d at 601.

Because we conclude that the district court did not abuse its discretion in granting the preliminary injunction relying on Plaintiffs' statutory claims, we need not and do not consider this alternate constitutional ground. *See Am. Foreign Serv. Ass'n v. Garfinkel*, 490 U.S. 153, 161 (1989) ("Particularly where, as here, a case implicates the fundamental relationship between the Branches, courts should be extremely careful not to issue unnecessary constitutional rulings.").

## V. Conclusion

For all of these reasons, we affirm in part and vacate in part the district court's preliminary injunction order. We narrow the scope of the injunction to give relief only to those with a credible bona fide relationship with the United States, pursuant to the Supreme Court's decision in *IRAP*, 137 S. Ct. at 2088. In light of the Supreme Court's order staying this injunction pending "disposition of the Government's petition for a writ of certiorari, if such writ is sought," we stay our decision today pending Supreme Court review. *Trump v. Hawai'i*, No. 17A550, — S. Ct. —, 2017 WL 5987406 (Dec. 4, 2017). Because we conclude

70

that Plaintiffs have shown a likelihood of success on their statutory claims, we need not reach their constitutional claims.

**AFFIRMED IN PART, VACATED IN PART.**

## Counsel page

Hashim M. Mooppan (argued), Deputy Assistant Attorney General; Sharon Swingle, H. Thomas Byron III, and Lowell V. Sturgill Jr., Appellate Staff; Chad A. Readler, Acting Assistant Attorney General; Jeffrey B. Wall and Edwin S. Kneedler, Deputy Solicitors General; Noel J. Francisco, Solicitor General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Mitchell P. Reich (argued), Neal Kumar Katyal (argued), Colleen Roh Sinzdak, Elizabeth Hagerty, Yuri S. Fuchs, Sundeep Iyer, and Reedy C. Swanson, Hogan Lovells US LLP, Washington, D.C.; Thomas P. Schmidt, Hogan Lovells US LLP, New York, New York; Sara Solow and Alexander B. Bowerman, Hogan Lovells US LLP, Philadelphia, Pennsylvania; Deirdre Marie-Iha, Donna H. Kalama, Kimberly T. Guidry, Robert T. Nakatsuji, Kaliko'Onalani D. Fernandes, and Kevin M. Richardson, Deputy Attorneys General; Clyde J. Wadsworth, Solicitor General; Douglas S. Chin, Attorney General; Department of the Attorney General, Honolulu, Hawaii; for Plaintiffs-Appellees.

Eric T. Schneiderman, Attorney General; Barbara D. Underwood, Solicitor General; Anisha S. Dasgupta, Deputy Solicitor General; Zainab A. Chaudhry, Assistant Solicitor General of Counsel; Office of the Attorney General, New York, New York; Lisa Madigan, Attorney General; David L. Franklin, Solicitor General; Office of the Attorney General, Chicago, Illinois; Xavier Becerra, Attorney General, Office of the Attorney General, Sacramento, California; George Jepsen, Attorney General, Office of the Attorney General, Hartford, Connecticut; Matthew P. Denn, Attorney General, Delaware Department of Justice, Wilmington, Delaware; Thomas J. Miller, Attorney General, Office of the Attorney General, Des Moines, Iowa; Janet T. Mills, Attorney General, Office of the Attorney General, Augusta, Maine; Brian E. Frosh, Attorney General, Attorney General's Office, Baltimore, Maryland; Maura Healey, Attorney General, Attorney General's Office, Boston, Massachusetts; Hector Balderas, Attorney General, Office of the Attorney General, Santa Fe, New Mexico; Ellen F. Rosenblum, Attorney General, Office of the Attorney General, Salem, Oregon; Peter F. Kilmartin, Attorney General, Office of the Attorney General, Providence, Rhode Island; Thomas J. Donovan Jr., Attorney General, Office of the Attorney General, Montpelier, Vermont; Mark R. Herring, Attorney General, Office of the Attorney General, Richmond, Virginia; Robert W. Ferguson, Attorney General, Office of the Attorney General, Seattle, Washington; Karl A. Racine, Attorney General, Office of the Attorney General, Washington, D.C.; for Amici Curiae States of New York, Illinois, California, Connecticut, Delaware, Iowa, Maine, Maryland, Massachusetts, New Mexico, Oregon, Rhode Island, Vermont, and Washington, the Commonwealth of Virginia, and the District of Columbia.

Scott A. Keller, Solicitor General; J. Campbell Barker, Deputy Solicitor General; Ari Cuenin, Assistant Solicitor General; Ken Paxton, Attorney General; Jeffrey C. Mateer, First Assistant Attorney General; Office of the Attorney General, Austin, Texas; for Amici Curiae States of Texas, Alabama, Arizona, Arkansas, Florida, Kansas, Louisiana, Missouri, Ohio, Oklahoma, South Carolina, and West Virginia.

Richard D. Bernstein, Willkie Farr & Gallagher LLP, Washington, D.C., for Amicus Curiae T.A., a U.S. Resident of Yemeni Descent.

Amir H. Ali, Washington, D.C., as and for Amicus Curiae Roderick & Solange MacArthur Justice Center.

Nicole G. Berner, Deborah L. Smith, and Leo Gertner, Service Employees International Union, Washington, D.C.; Judith Rivlin, American Federation of State, County and Municipal Employees, Washington, D.C.; David J. Strom, American Federation of Teachers, AFL-CIO, Washington, D.C.; Jody Calemine, Communications Workers of America, Washington, D.C.; Niraj R. Ganatra and Ava Barbour; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; Detroit, Michigan; Mario Martínez, Martínez Aguilasocho & Lynch APLC, Bakersfield, California; Nicholas Clark, United Food and Commercial Workers, Washington, D.C.; for Amici Curiae International Labor Organizations.

Lynne Bernabei and Alan R. Kabat, Bernabei & Kabat PLLC, Washington, D.C., for Amici Curiae Civil Rights Organizations.

Aaron X. Fellmeth, Sandra Day O'Connor College of Law, Arizona State University, Phoenix, Arizona; Joseph M. McMillan and Michelle L. Maley, Perkins Coie LLP, Seattle, Washington; for Amici Curiae International Law Scholars and Nongovernmental Organizations.

Benjamin G. Schatz, Amy Briggs, John W. McGuinness, Sirena Castillo, Matthew Bottomly, Olufunmilayo Showole, Ketakee Kane, and Eve Torres, Manatt Phelps & Phillips LLP, Los Angeles, California, for Amici Curiae Muslim Justice League, Muslim Public Affairs Council, and Council of American-Islamic Relations California.

Marc A. Hearron, Sophia M. Brill, and Sandeep N. Nandivada, Morrison & Foerster LLP, Washington, D.C.; Jennifer K. Brown and Amanda Aikman, Morrison & Foerster LLP, New York, New York; Purvi G. Patel, Morrison & Foerster LLP, Los Angeles, California; for Amici Curiae Interfaith Group of Religious and Interreligious Organizations and Clergy Members.

Fatma Marouf, Fort Worth, Texas; Sabrineh Ardalan, Philip L. Torrey, Nathan MacKenzie, Dalia Deak, Niku Jafarnia, and Rachel Kroll, Cambridge, Massachusetts; Geoffrey Hoffman, Houston, Texas; Karla McKanders, Nashville, Tennessee; for Amici Curiae Immigration Law Scholars on Statutory Claims.

Donald Francis Donovan, David W. Rivkin, Jennifer R. Cowan, and Elizabeth Nielsen, Debevoise & Plimpton LLP, New York, New York; Ilana H. Eisenstein, John M. Leitner, and Ryan S. Macpherson, DLA Piper LLP (US), Philadelphia, Pennsylvania; for Amicus Curiae International Bar Association's Human Rights Institute.

Elizabeth B. Wydra, Brianne J. Gorod, and David H. Gans, Constitutional Accountability Center, Washington, D.C.; Raymond H. Brescia, Albany, New York; Peter Karanjia and Geoffrey Brounell, Davis Wright Tremaine LLP, Washington, D.C.; Victor A. Kovner, Davis Wright Tremaine LLP, New York, New York; for Amici Curiae Members of Congress.

Christopher J. Hajec, Julie B. Axelrod, Michael M. Hethmon, Elizabeth A. Hohenstein, and Mark S. Venezia, Washington, D.C., as and for Amicus Curiae Immigration Reform Law Institute.

Cameron C. Russell, David Y. Livshiz, and Karen Wiswall, Freshfields Bruckhaus & Deringer US LLP, New York, New York; Daniel Braun and Peter Jaffe, Freshfields Bruckhaus & Deringer US LLP, Washington, D.C.; for Amicus Curiae The Cato Institute.

Meir Feder, Rasha Gerges Shields, and Rajeev Mittreja, Jones Day, New York, New York; Catherine Y. Kim, New York, New York; Judith Resnik, New Haven, Connecticut; Burt Neuborne, New York, New York; Lucas Guttentag, Palo Alto, California; for Amici Curiae Professors of Federal Courts Jurisprudence, Constitutional Law, and Immigration Law.

Lindsay C. Harrison, Thomas J. Perrilli, and Tassity S. Johnson, Jenner & Block LLP, Washington, D.C.; for Amici Curiae Boston University, Brandeis University, Brown University, Bucknell University, Carnegie Mellon University, Case Western Reserve University, Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, George Washington University, Georgetown University, Harvard University, Johns Hopkins University, Massachusetts Institute of Technology, Middlebury College, Northeastern University, Northwestern University, Princeton University, Rice University, Stanford University, Tufts University, University of Chicago, University of Michigan, University of Pennsylvania, University of Southern California, Vanderbilt University, Washington University, Worcester Polytechnic Institute, and Yale University.

Benna Ruth Solomon, Deputy Corporation Counsel; Edward N. Siskel, Corporation Counsel; Andrew W. Worseck, Chief Assistant Corporation Counsel; Carl Newman, Sara K. Hornstra, and Jonathon D. Byrer, Assistant Corporation Counsel; Department of Law, Chicago, Illinois; Nick Kahlon, Riley Safer Holmes & Cancila LLP, Chicago, Illinois; Ryan P. Poscablo, Brian Neff, and Eliberty Lopez, Riley Safer Holmes & Cancila LLP, New York, New York; Michael N. Feuer, Los Angeles City Attorney, Los Angeles, California; Zachary W. Carter, Corporation Counsel, New York Law Department, New York, New York; Sozi Pedro Tulante, City Solicitor, Law Department, Philadelphia, Pennsylvania; John Danial Reaves, Washington, D.C.; for Amici Curiae Chicago, Los Angeles, New York, Philadelphia, and other Cities and Counties, joined by the U.S. Conference of Mayors.

Richard B. Katskee, Eric Rothschild, and Kelly M. Percival, Americans United for Separation of Church and State, Washington, D.C.; Elliot M. Mincberg and Diane Laviolette, People for the American Way Foundation, Washington, D.C.; Gillian B. Gillers, Kristi L. Graunke, and Naomi R. Tsu, Southern Poverty Law Center, Decatur, Georgia; Susan L. Sommer, Lambda Legal Defense and Education Fund Inc., New York, New York; Camilla B. Taylor, Lambda Legal Defense and Education Fund Inc., Chicago, Illinois; Sharon M. McGowan, Lambda Legal Defense and Education Fund Inc., Washington, D.C.; Jennifer C. Pizer, Lamba Legal Defense and Education Fund Inc., Los Angeles, California; for Amici Curiae Members of the Clergy, Americans United for Separate of Church and State, Bend the Arc, A Jewish Partnership for Justice, Central Conference of American Rabbis, Lambda Legal Defense and Education Fund

Inc., People for the American Way Foundation, Riverside Church in the City of New York, Southern Poverty Law Center, Union for Reform Judaism, and Women of Reform Judaism.

Andrew J. Pincus, Paul W. Hughes, and John T. Lewis, Mayer Brown LLP, Washington, D.C., for Amici Curiae Technology Companies.

Pratik A. Shah and Martine E. Cicconi, Washington, D.C.; Robert S. Chang and Lorraine K. Bannai, Ronald A. Peterson Law Clinic, Seattle University School of Law, Seattle, Washington; Eric Yamamoto, Fred T. Korematsu Professor of Law and Social Justice, William S. Richardson School of Law, University of Hawaii, Honolulu, Hawaii; Robert L. Rusky, San Francisco, California; Dale Minami and Donald K. Tamaki, Minami Tamaki LLP, San Francisco, California; Peter Irons, Director Emeritus, Earl Warren Bill of Rights Project, University of California at San Diego, San Diego, California; Leigh-Ann K. Miyasato, Honolulu, Hawaii; Rodney L. Kawakami, Seattle, Washington; Robert A. Johnson and Alice Hsu, Akin Gump Strauss Hauer & Feld LLP, New York, New York; Jessica M. Weisel, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California; for Amici Curiae Karen Korematsu, Jay Hirabayashi, Holly Yasui, The Fred T. Korematsu Center for Law and Equality, Civil Rights Organizations, and National Bar Associations of Color.

Matthew E. Sloan, Richard A. Schwartz, Allison B. Holcombe, Alyssa J. Clover, nad Brittany Ellenberg, Skadden Arps Slate Meagher & Flom LLP, Los Angeles, California; Eric J. Gorman and Jennifer H. Berman, Skadden Arps Slate Meagher & Flom LLP, Chicago, Illinois; Noelle M. Reed, Sarah Grossnickle, and Jonathan Fombonne, Skadden Arps Slate Meagher & Flom LLP, Houston, Texas; Joseph M. Sandman, Skadden Arps Slate Meagher & Flom LLP, Washington, D.C.; Aaron Morris, Immigration Equality, New York, New York; Virginia M. Goggin, New York City Gay and Lesbian Anti-Violence Project, New York, New York; Glenn Magpantay, The National Queer Asian Pacific Islander Alliance, New York, New York; for Amici Curiae Immigration Equality, New York City Gay and Lesbian Anti-Violence Project, LGBT Bar Association of Los Angeles, LGBT Bar Association of Greater New York, Lesbian and Gay Bar Association of Chicago, GLBTQ Legal Advocates & Defenders, and Bay Area Lawyers for Individual Freedom.

Alan E. Schoenfeld and Scott McAbee, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Peter Margulies, Roger Williams University School of Law, Bristol, Rhode Island; for Amici Curiae Scholars of Immigration Law.

Dan Jackson, John W. Keker, and R. Adam Lauridsen, Keker Van Nest & Peters LLP, San Francisco, California, for Amicus Curiae Khizr Khan.

Brett R. Tobin, Goodsill Anderson Quinn & Stifel, Honolulu, Hawaii; Michael B. Keating, Kristyn M. Defilipp, Christopher E. Hart, and Daniel L. McFadden, Foley Hoag LLP, Boston, Massachusetts; for Amicus Curiae Massachusetts Technology Leadership Council Inc.

Robert A. Wiygul and Mark A. Aronchick, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, Pennsylvania, for Amici Curiae Immigration, Family, and Constitutional Law Professors.

James W. Kim and Andrew J. Genz, McDermott Will & Emery LLP, Washington, D.C.; Tina R. Matsuoka, Navdeep Singh, Meredith S.H. Higashi, Rachana Pathak, and Albert Giang, National Asian Pacific American Bar Association, Washington, D.C.; for Amicus Curiae National Asian Pacific American Bar Association.

Herbert W. Titus, William J. Olson, Robert J. Olson, and Jeremiah L. Morgan, William J. Olson P.C., Vienna, Virginia; Joseph W. Miller, Fairbanks, Alaska; for Amici Curiae Citizens United, Citizens United Foundation, Conservative Legal Defense and Education Fund, U.S. Justice Foundation, Gun Owners Foundation, Gun Owners of America Inc., Public Advocate of the United States, Restoring Liberty Action Committee, English First, English First Foundation, and Policy Analysis Center.

Yolanda C. Rondon, Samer E. Khalaf, and Abed A. Ayoub, Washington, D.C., as and for Amicus Curiae American-Arab Anti-Discrimination Committee.